In re Leroy NUTTING and Sandra Nutting d/b/a Town Market, Debtors.

Leroy NUTTING and Sandra Nutting d/b/a Town Market, Plaintiffs,

v.

BRADFORD NATIONAL BANK, Defendant.

Bankruptcy No. 84–105.
Adv. No. 84–0061.

United States Bankruptcy Court,
D. Vermont.

Nov. 21, 1984.

David A. Otterman, Bradford, Vt., for debtors.

Gavin A. Reid, Newburg, Vt., for Bradford Nat. Bank.

## MEMORANDUM AND ORDER

CHARLES J. MARRO, Bankruptcy Judge.

The matter is before the Court on the complaint of the debtors (Nutting) against the Bradford National Bank (Bank) to avoid a preferential transfer and for damages, and the Bank's objection to certain exemptions claimed by the Nuttings.

### FACTS

The Nuttings, formerly owner-operators of a food store known as the "Town Market" in Bradford, Vermont, filed a petition for relief under chapter 7 of the Bankruptcy Code (Code) on June 12, 1984. The schedules filed in connection with the petition identify the Bank as a secured party with respect to all assets of the Town Market. The aggregate indebtedness to the Bank is $91,000.

The Nuttings' purchased the Town Market in July 1979 at which time the Bank advanced $20,000 for equipment and a further $20,000 for inventory. In connection with the $40,000 business loan, the Nuttings executed a security agreement granting the Bank a security interest in store

machinery, equipment, furniture, fixtures, and inventory. The Nuttings also executed and delivered to the Bank a second mortgage on their personal residence subject to a first mortgage, held by the Bank, for a prior $15,000 loan.

Initially, Town Market drew roughly $6,000 per week in sales. However, volume decreased rapidly and the Nuttings negotiated the following business loans with the Bank:

(1) $15,000 in February 1980 for the purpose of enabling payment on certain overdrafts existing with respect to the business. As security, the Nuttings executed a security agreement granting the Bank a security interest in all personal property of the business.

(2) $25,000 in May 1980, representing a rewrite of the $15,000 February 1980 loan, coupled with $10,000 in new money. The $25,000 note was secured by the security agreement of February 1980 granting the Bank a security interest in all business personal property. As further security the Nuttings, contemporaneously with executing the $25,000 note, executed and delivered to the Bank an assignment of their savings account number 1500897 comprised of a certificate of deposit (CD) issued by the Bank to the Nuttings on April 2, 1980, in the amount of $1,625 with a maturity date of October 2, 1982. The CD was subsequently renewed to a stated maturity of April 2, 1985.

(3) $7,000 in August 1981 for the purpose of paying insurance premiums.

(4) $26,530 in June 1982 as a rewrite of the $25,000 May 1980 loan. No new money was advanced by the Bank. As security, the Nuttings executed and delivered to the Bank a security agreement granting a security interest in all furniture, fixtures, machinery, equipment, stock, inventory, accounts receivable, and present or future contract rights. The Nuttings also executed a mortgage note with respect to this loan.

(5) $73,000 in December 1982 as a consolidation loan to refinance existing loans.

The transaction is evidenced by a mortgage note and a security agreement granting a security interest in all personal property at the Town Market premises. As rewritten, the May 1980 and June 1982 notes were stamped "PAID BY RENEWAL".

The Town Market continued to run in red ink. The Nuttings defaulted on payments to the Bank. The Bank foreclosed on the Nutting residence and the personal property collateral. In May 1984 the Nuttings closed the store and turned over the premises to the Bank. Mr. Nutting thus began a period of unemployment. Without income, the Nuttings relied on relatives for food and other goods. The roof of the Nutting residence began to leak during the redemption period. Leroy Nutting's health declined to a point of serious general physical impairment accompanied by gastro-intestinal disorders.

During Mr. Nutting's period of unemployment he attempted without success to obtain possession of the CD from a Bank teller. (Mr. Nutting did not, however, ask for release of the CD from the loan department which held it as security). Thereafter, in July 1984, the Nuttings' attorney sent the Bank's attorney a request letter seeking release of the CD on the ground that the Nuttings had no recollection of having executed the 1980 assignment document. In response to the request letter, the Bank informed Nuttings' attorney that it had cashed out the CD four days after going into possession of the Town Market premises, and had applied the proceeds towards the Nuttings' loan indebtedness in the expectation that exhaustion of the collateral would not fully cover the debt. When cashed out the CD yielded proceeds of $2,454. At the time the Bank cashed out the CD the Nuttings were insolvent, as the Bank knew. The Nuttings claim the proceeds of the CD as exempt property in the petition for relief.

The Bank has remained at all times in continuous possession of the CD and the 1980 assignment document.

## DISCUSSION

In broad terms, the issue is whether the $73,000 loan was secured in part by the CD.

 Loan documents creating liens on real or personal property may be written to secure both present debt and future advances. 8 Vt.Stat. § 1207. A "future advance clause" or accrual clause operates to extend the bank's lien to future lending where the parties contemporaneously with the subsequent loan transaction intend the loan to be secured by the prior security interest. A prerequisite to secured status under an accrual clause is a showing by the lender that such intent existed at formation of the subsequent loan agreement. *Bloom v. First Vermont Bank*, 133 Vt. 407, 410, 411, 340 A.2d 78 (1975). In the pending matter, the general rule would mean that the CD assigned as security in 1980 could not serve as security for either the June 1982 rewrite loan or the December 1982 consolidation loan unless the Nuttings so intended on the respective dates of execution of the 1982 loan agreements. The Nuttings argue that they never intended that the CD secure either 1982 loan, and cite the fact that no security agreement nor any filed financing statement lists the CD as collateral. However, the language of the 1980 assignment in relevant part provides:

> For Value Received, we hereby assign to you our savings account No. 1500897 as security for Security Agreement Installment Loan, Twenty five thousand and no/100 Dollars (25,000.00).

> This assignment shall be a continuing one and shall be effective for any renewals of above loan until same is entirely paid; and shall operate as security for payment of any other debts or liabilities of the undersigned to you now in existence or hereafter contracted.

> You are hereby authorized to charge against the above savings account, any note or notes representing unpaid balance of above loans at maturity or thereafter, with interest and costs, if not otherwise paid.

> Signed: Leroy C. Nutting,
> Sandra L. Nutting.

The Bank's perfection of the security interest in 1980 by possession of the CD brings the instant matter within the rule of *In re McQueen*, 27 B.R. 717 (Bankr.D.Vt.1983). In *McQueen* this court noted that a perfected security interest under a document which expressly addresses future advances

> is, by its terms, a "continuing agreement" until revoked by the debtor upon notice to the creditor. In the absence of such revocation, neither ... renewal of the original obligation, nor the fact that no financing statement was filed in connection with the future advances, results in an impediment to the creditor's continuing security interest. *See In re Peska Associates, Inc.*, 27 U.C.C.Rep.Serv. 273, 277 (S.D.N.Y.1979); *In re Gilchrist*, 403 F.Supp. 197, 18 U.C.C.Rep.Serv. 242 (E.D.Pa.1975) aff'd without opinion, 535 F.2d 1246 (3rd Cir.1976); *In re Rivet*, 299 F.Supp. 374, 377, 6 U.C.C.Rep.Serv. 460 (E.D.Mich.1969); *Thorp Finance Corp. v. Hodgins*, 73 Mich.App. 428, 251 N.W.2d 614, 21 U.C.C.Rep.Serv. 881 (1977).

*See also Reed v. Barron*, 135 Vt. 582, 381 A.2d 1065 (1977) *distinguishing Bloom supra*. Thus, execution of a renewal note does not as a matter of law expunge the incidents of the renewed note, *In re Thayer*, 38 B.R. 412, 419 (Bankr.D.Vt.1984); where the debtor executes renewal notes with the intent that the original security continue, the original security becomes an incident of the renewal note, *id*. The result in the instant case is that the CD was part of the security with respect to the consolidation loan, for the reason that the Nuttings executed the rewrite and consolidation loan documents with the intent that the certificate of deposit remain hypothecated as security, *see* discussion *supra* re *McQueen*. Ingredient to the foregoing result is the fact that the May 1980 obligation was never extinguished by payment in full, cancellation, or relinquishment, *see Thayer supra*, 38 B.R. at 419 for discussion as to the effect of payment by renew-

al. *See generally, In re Conn,* 16 B.R. 454 (Bankr.W.D.Ky.1982) (purchase money security interest not invalid on ground that item secures more than its price, and such interest may survive multiple refinancing); *Robinson v. Leach,* 67 Vt. 128, 31 A. 32 (1895) (as long as original debt is not paid and can be traced, the security remains). As noted, the Bank maintained perfection of its continuing security interest by remaining in continuous possession of the certificate and the assignment document.

■ That the assignment document was not dated does not render it invalid as a matter of law; even an oral assignment of personal property coupled with possession of the subject matter of the assignment may be given legal effect. That the Nuttings have no recollection of executing the assignment, or even that in testimony they denied executing the document, does not render the assignment unenforceable in this proceeding; the signatures are presumed valid under Vermont Statutes, title 9A, section 3–307(1)(b), and the authenticity of the signatures and the time of execution was corroborated at trial.

As the CD secured the consolidation loan, the Bank was entitled by the language of the assignment to liquidate such security upon the prepetition event of default. In that there was no agreement between the parties fixing the priority of liquidation of the various collateral, the Bank had the right to proceed against its collateral in whatever priority it chose, or against all collateral simultaneously. No effect is to be given to the Nuttings' bare assertion that they relied on the Bank to proceed first against collateral other than the CD and only thereafter to exercise rights under the assignment document. There is no merit to the argument that the Bank impliedly contracted to exercise rights against the collateral listed in the security agreement before cashing out the CD; unambiguous and supported by consideration, the clear language of the assignment contract does not impose a burden on the Bank to liquidate the collateral seriatim. Such a burden would be in conflict with, and would vary the plain English

of, the contract setting forth the bargain of the parties. A burden of this nature would be so ingredient to the bargain that the absence of language imposing such a burden speaks for itself.

■ For the reason that the 1980 and 1982 notes each contained an acceleration clause waiving notice, the Bank did not act wrongfully when it proceeded against its collateral upon the event of default on the consolidation loan. Under the assignment the Nuttings had no right to possess the CD until the consolidation loan was paid in full, and the Bank was authorized to withhold delivery of the certificate until the secured debt was extinguished. *See Miller v. Merchants Bank,* 138 Vt. 235, 415 A.2d 196 (1980). On the facts, the Bank's refusal to deliver the CD on demand did not constitute a wrongful conversion of the account, for the reason that, at the time of making demand, Mr. Nutting had no right to immediate possession of the CD or its proceeds.

■ Moreover, the Bank need not have been the Nuttings' assignee to lawfully access the CD proceeds for the purpose of applying the same against the instant indebtedness. A security as defined by both federal and state securities law, *see* 15 U.C.C. § 77b(1) and 9 Vt.Stat. § 4202(9), the certificate in the hands of the Bank was amendable to setoff under Vermont law. *See Goodwin, Trustee v. Barre Sav. Bank & Trust Co.,* 91 Vt. 228, 100 A. 34 (1917) (securities and funds of customer which come into possession of bank in regular course of bank's business are subject to setoff against customer's matured debt without customers direction or authority). Code section 553 recognizes the right to setoff under state law. On the facts, however, the Bank held a security interest in the security instrument itself, and could as of right liquidate the instrument as collateral.

■ As to the proposition that the Bank's act of cashing the CD constituted a preferential transfer under Code section 547, the Nuttings bear the burden of estab-

lishing that the transfer (1) occurred within 90 days of bankruptcy day, and (2) enabled the Bank to realize more proceeds that it would have realized if such transfer had not been made. *See In re Thayer,* 38 B.R. 412, 421 (Bankr.D.Vt.1984); *In re Music House,* 11 B.R. 139, 140 (Bankr.D.Vt.1980). Both elements must be present. *See Matter of Quest, Inc.,* 17 B.R. 359, 361 (Bankr. E.D.Va.1982). The court observes that the relevant transfer took place by way of assignment and perfection of the assigned interest in 1980, some years outside the preference period. *See In re Gurs,* 34 B.R. 755 (Bankr.App. 9th Cir.1983); *In re Ewing,* 36 B.R. 476 (W.D.Pa.1984). Assuming *arguendo* that the cashing out of the CD on May 23, 1984, could pass muster as a transfer, such transfer did not enable the Bank to realize more proceeds than it would have realized if the transfer had not been made, for the reason that no one held an interest in the CD superior to the interest of the Bank who in any event would therefore sooner or later obtain, without improving its position vis-a-vis other creditors, the proceeds of the CD. In short, the Nuttings' preferential transfer claim fails.

██ The Bank's objection to the claim of exempt property with respect to the proceeds is well taken. The assignment in 1980 constituted a voluntary transfer, and no debtor may avoid a consensual lien under Code section 522(h). The section enables the debtor in lieu of the trustee to avoid an involuntary transfer of property that would be exempt if the transfer is avoided. *See Senate Report* 989, 95th Cong., 2d Sess. 75 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. Code section 522(h) is not authority for the proposition that the debtor may avoid a voluntary transfer. (As previously noted, the 1981 and 1982 refinance transactions did not vitiate the voluntariness of the 1980 transfer, with the result that the consensual lien subsisted).

██ There is no merit to the argument that the $103 penalty attending the premature cashing out of the CD, which penalty was deducted from the proceeds of the CD

with the remaining balance applied to the debt, is to be carried by the Bank. The assignment authorizes the Bank to cash out the CD without notice upon the event of default, and the CD expressly describes a penalty fixed by formula in the event that the CD is prematurely cashed out. By executing the assignment with knowledge of the CD contract terms, the Nuttings effectively consented to bear the instant penalty in the event that the Bank liquidated the CD following a default by the Nuttings on their obligation to the Bank. The CD is collateral, and the Bank bargained for, and obtained, the right to liquidate it in the event of default. The court construes the term "maturity" on the assignment document to mean the date at which the obligation became due. *See Black's Law Dic.* (5th ed. 1979). Under the acceleration clause of the consolidation loan note, the obligation became "due and payable without notice" when the default on payment was not made good prior to the due date of the installment next following the date of default. The court is not empowered to refashion the parties' bargain to require the Bank to hold the CD until stated maturity under pain of incurring the instant penalty, which under banking law the Bank was required to impose.

In sum, the Bank acted within its rights when it applied the CD proceeds, such as the proceeds were, to the instant debt. It follows that, as there was no wrongful act here, there is no basis for an award of damages, or for attorney's fees, to the Nuttings. Further, as the Nuttings' complaint was not frivolous and the issues in the case presented numerous questions, an award of attorney's fees to the Bank would be equally inappropriate.

### ORDER

On the foregoing,

IT IS ORDERED

(1) that the debtors complaint to avoid preferential transfer and for damages is DISMISSED with prejudice;

(2) the request of the Bradford National Bank for attorney's fees incurred in connection with defending against the instant complaint is DENIED; and

(3) the motion of the Bradford National Bank to disallow exemptions is GRANTED.